# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROGER WOODS, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
|     v. | : | NO. 2:08-cv-02495-WY |
| | : | |
| ERA MED LLC, JOHN HUSTWIT, SEACOR | : | |
| HOLDINGS INC., JOHN DOES (heretofore unidentified | : | |
| individuals) and ABC ENTITIES (heretofore | : | |
| unidentified corporations, partnerships, and/or other | : | |
| business entities), | : | |
|     Defendants. | : | |

**Memorandum**

YOHN, J.                                                                                     January 7, 2010

Defendants Era Med LLC, John Hustwit, and Seacor Holdings, Inc., move for summary judgment as to the three claims of plaintiff, Roger Woods, that remain in this case: breach of contract (Count I), promissory estoppel (Count III), and fraud (Count V). The parties dispute whether defendants' job offer to plaintiff – a job he did not start because defendants allegedly failed to support his visa application to work in the United States – was for employment for a definite period of time. The parties also dispute whether he suffered such hardship in reliance on the offer that his position could only be terminated for just cause. I conclude that, even viewing the facts in the light most favorable to plaintiff, his job offer was not for employment for a definite period of time and he did not suffer substantial hardship in reliance upon the offer. I also conclude that Pennsylvania does not recognize a claim for promissory estoppel in the employment context. I further conclude that no set of facts exists on the record that could establish plaintiff's claim for fraud. I will therefore grant summary judgment in favor of defendants and against plaintiff.

## I.    Factual and Procedural Background

Plaintiff is a British citizen. (Defs.' Statement of Material Facts ("Defs.' Stmnt. of Facts") Ex. A (Woods Dep.) 207:25-208:1.) In March 2007, discussions began between plaintiff and Era Med, an emergency-medicine transportation company, for him to work as a helicopter pilot.[1] (Id. at 27:2-17; 173:16-174:8; id. at Ex. B and G.) He claims defendants offered to employ him for "one to three years" based on the length of the term of the O-1 visa he needed to work for defendants in the United States.[2] (Pl.'s Br. at 2.) He claims defendants promised to support his O-1 visa application by supplying "basic but necessary information" but "failed to support the application from the inception." (Id. at 4, 7.) He claims he incurred substantial hardship in reliance on defendants' job offer by taking additional flight training and by foregoing another job opportunity. (Id. at 5.)

Plaintiff brought the instant case on May 29, 2008, under the court's diversity jurisdiction, asserting counts for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, negligence, and fraud.[3] After I dismissed plaintiff's claims

---

[1] Plaintiff communicated first with a company related to Era Med known as "Keystone Helicopters." (Defs.' Stmnt. of Facts Ex. B; id. at Ex. A (Woods Dep.) 27:11-17, 173:16-22.)

[2] Plaintiff sued not only Era Med but also its Director of Operations, John Hustwit, and its parent company, Seacor Holdings Inc. (Compl. ¶ 2, 3.) Plaintiff applies the allegations of his complaint equally to these defendants, under the theory that Hustwit acted on Era Med's behalf and that Seacor ratified the actions of Hustwit and Era Med. (Id. at 5-6, 8-9)

[3] Plaintiff also included a separate, sixth count of his complaint in which he sued a number of unidentified individuals and entities "for the express purpose of tolling the applicable statute of limitations." (Compl. ¶ 30.) Plaintiff has yet to name or serve the unidentified defendants, even though (1) the court's November 17, 2008, Scheduling Order required plaintiff to name all John Doe defendants within 60 days of that order, and (2) the clerk notified plaintiff's counsel in a letter on July 21, 2009, that service on the John Doe defendants should be made by August 21, 2009, in accordance with Fed. R. Civ. P. 4(m), or the court would dismiss the action as to these defendants for lack of prosecution. Because plaintiff has not complied with these requirements and because, as discussed below, I will grant judgment against plaintiff on all of his remaining substantive claims, I will grant judgment against plaintiff as to Count VI.

for breach of the implied covenant of good faith and fair dealing and for negligence, and after the parties engaged in discovery, defendants moved for summary judgment in their favor on plaintiff's remaining claims. The facts of the instant case, which I view in the light most favorable to plaintiff, the non-moving party, are as follows.

**A.     The Negotiation of Era Med's Job Offer to Plaintiff**

On March 2, 2007, plaintiff sent an email to a representative of Keystone Helicopters, a corporation related to Era Med, inquiring about job opportunities. (Defs.' Stmnt. of Facts Ex. B.) In that email, plaintiff stated that he wished to work in the United States but that in order to obtain a visa to work in this country he first needed to secure an offer of employment:

> The rush will soon be on for Visa applications (April 1st) , unfortunately it's catch 22 in that I need a job offer to get one and most employers seem to want you with a work Visa prior to offering a job! the Visa application is very straight forward for the employer to fill in; I just need to find a company willing to do so. [sic]

(Id.) Plaintiff stated that he also planned to obtain from the Federal Aviation Administration (the "FAA") an additional helicopter-pilot license – an "Airline Transport Pilot" license (an "FAA-ATP" license) – and would be flying to the United States "very soon" for the necessary instructional course. (Id.) "I am currently in the UK," he stated, "but due to go the Florida very soon for my FAA ATP, CFI ["Certified Flight Instructor"] and CFII ["Certified Flight Instructor Instrument"] (should be finished mid April) [sic]." (Id.)

On March 8, 2007, a representative of Era Med, Larry Murphy, emailed plaintiff regarding plaintiff's interest in a job with the company. (Pl.'s Counter-Statement of Material Facts ("Pl.'s Stmnt. of Facts") Ex. H.) On or about the same day, plaintiff spoke with Murphy by telephone. (Id. at Ex. A (Woods Dep.) 28:7-25.) As part of that conversation, plaintiff explained his visa issue: "I said at the time that I was obviously a UK citizen looking to work over there,

there would be a visa issue." (<u>Id.</u> at 29:11-17.) Plaintiff promised to look into the different options he might have for obtaining such a visa. (<u>Id.</u>)

Later that day, plaintiff followed up his conversation with Murphy with an email. (<u>Id.</u> at Ex. H.) Plaintiff confirmed that "as discussed I am looking to settle in America and therefore actively seeking employment [sic]." (<u>Id.</u>) He reiterated that "I am extremely keen to relocate to America and I am confident that my knowledge, skills and abilities will be a huge asset to EraMed." (<u>Id.</u>) Plaintiff stated that he held a variety of licenses, certificates, and qualifications from several governmental authorities to fly helicopters. (<u>Id.</u>) He also stated that "I am looking to attend a rotorcraft course during the later part of March; on completion (mid April) I will have an FAA ATP, CFI and CFII for rotorcraft." (<u>Id.</u>) With respect to his visa issue, plaintiff stated that he would need a job offer first:

> Visa's, Larry there are several visa options, indeed it may even be possible to apply for a special visa given the EMS requirement, I have had to become a bit of an expert in this field, suffice it to say that a visa must be based on a job offer but after that the process is very straight forward. [sic]

(<u>Id.</u>) Plaintiff planned "to be in Philadelphia by the night of the 18th at the latest." (<u>Id.</u>)

On March 13, 2007, plaintiff sent an email to Murphy again. In the email, plaintiff stated that "[t]o keep you updated I am still looking at travelling to America next week, if required i can fly to be there for Monday the 19th, i will certainly be in the US by the 21st [sic]." (<u>Id.</u>) Plaintiff further stated that "i am booked to start my ATP, CFI/II course the following Monday [sic]." (<u>Id.</u>)

Murphy and plaintiff exchanged additional emails on March 13, 2007, in which they discussed the scheduling of an interview with Era Med for March 21, 2007. (<u>Id.</u>) Plaintiff inquired as to whether Human Resources was "happy with the work Visa requirements." (<u>Id.</u>) Murphy responded as follows:

I haven't done anything with that other than tell them of the requirement. There did not seem to be any issue raised over it. **I told them that other that** [sic] **completing some required forms on the actual employment offer, that you would handle all other details.** The only thing mentioned, and you might want to be able to field it, was as to motivation. Why does he want to come here, (a girl friend isn't always necessarily permanent). Is he using us just to get here?

(<u>Id.</u>) (Emphasis added.)

Plaintiff met in person with John Driscoll, a representative of Era Med, on March 21, 2007, and with Murphy two days later. (<u>Id.</u> at Ex A (Woods Dep.) 30:10-21.) Plaintiff "had a very in-depth conversation" with both of them about the kind of visa that he would seek, known as an "O-1 visa." (<u>Id.</u> at 34:24-35:2, 35:21-25.) An O-1 visa is a type of skill-based visa reserved for individuals with "extraordinary" abilities. 8 C.F.R. § 214.2(o). Plaintiff explained that he would need Era Med's "support" to obtain an O-1 visa:

> I explained to them that the requirement from the company would be a reference letter, if you want, just saying that they supported my visa, and the – it wouldn't go into, you know, these vastly technical sides of it, but it would have to support that I had the extraordinary ability because of that diversity. I made it very clear to them that they weren't writing as to say how good Roger Woods is as a hands-on pilot, because they can't judge that, but what they could judge to is what my body of work is.

(Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 36:24-37:8; <u>see also</u> <u>id.</u> at 183:12-14.) Plaintiff did not tell Era Med's representatives the details of what would need to be in the letter. (Defs.' Stmnt. of Facts Ex. A (Woods Dep.) 258:4-259:9.) He did explain to them that he would also need "a resume or biographical information" for "whoever provided the reference letter" as well as "a fact sheet on the company" in order to "provide proof that it was a legitimate company, a legitimate job, with a legitimate wage." (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 37:9-25.)

Plaintiff also explained that he would pay for his own immigration attorneys to prepare the O-1 visa application and to file it. (<u>Id.</u> at 38:8-13; 78:5-8; 110:4-6; 111:2-4; 113:25-114:4; 118:4-15.) He claimed that there would be "no risk" and "no outlay" on Era Med. (Defs.'

Stmnt. of Facts Ex. A (Woods Dep.) 49:7-10; 95:17-21.)  He further explained that he would pay

for the FAA-ATP course himself.  (Id. at 38:13-16; 49:7.)  He believed, however, that the FAA-

ATP course was a requirement for the job with Era Med, because he believed that he would not

be permitted to work in the United States as a helicopter pilot without it.  (Pl.'s Stmnt. of Facts

Ex. A (Woods Dep.) at 119:4-12.)

At the end of these interviews, Murphy told plaintiff that the job was plaintiff's and that

Era Med "would remove the advertisement for it."  (Id. at 45:18-11.)  "So, on that basis we were

both proceeding, in my view, that pending the outcome of the 01 visa, of course, the position was

mine."  (Id. at 45:24-46:1.)

### B.   Plaintiff's Additional Helicopter Training and Attempts to Prepare an O-1 Visa Application

Plaintiff had booked the FAA-ATP course "at some point" in March 2007 but, at his

deposition, did not recall the exact date.  (Id. at 46:17.)  After having interviewed with Driscoll

and Murphy, plaintiff believed that Hustwit, Era Med's Director of Operations, was going to call

him "to work out terms and conditions" of the job offer and was then going to send him a written

offer letter.  (Id. 45:17-18; 47:3-6.)  When plaintiff "booked onto the ATP course" he spoke to

Murphy again and expressed concern that he "hadn't received any call from John Hustwit."  (Id.

45:9-12.)  "[E]ventually John [Hustwit] did contact me.  We did work out the terms and

conditions of the offer letter, and I booked on a course."  (Id. at 46:10-12.)  Plaintiff started the

course on approximately April 5, 2007.  (Id. at 46:18-19.)  As plaintiff "was leaving on the

airplane to go down to Florida" for the course, he spoke to Murphy again to request the written

offer letter "[b]ecause I've booked a course and I've booked attorneys."  (Id. at 47:11-12.)

On April 7, 2007, plaintiff emailed Murphy requesting the written offer letter again.

(Defs.' Stmnt. of Facts Ex. G.)  Plaintiff stated that "I have now started the ATP, CFI/II course,

all is going well. [sic]" (Id.)  Plaintiff then tried to allay Murphy's concerns regarding plaintiff's

O-1 visa application:

> Larry I can assure you that I have spent many a day researching this issue, I have engaged the services of a top class immigration attorney, bottom line is that I would not be spending $8,500 on him and a further $14,000 my course were I not confident that a visa would be possible . . . .  Of course, nothing is 100% but **the risk I'm sure you will agree is all mine!** [sic]

(Id.) (Emphasis added.)  Plaintiff also stated that Era Med could alter as it saw fit the draft letter

of recommendation that plaintiff would send them to sign:

> The company will not really have to do much for the visa, my attorney will draft a letter from the information that I have given him . . . all the company will have to do is to put the petition letter onto company headed paper, clearly only after confirming that the details are both correct and factual . . . .  Which they will be, but **you can make any changes that you wish.** [sic]

(Id.) (Emphasis added.)  Plaintiff then sought Murphy's help to obtain a written offer letter:

> What is needed at this stage is a employment 'offer letter.'  Larry I have been trying for several days to speak to [Hustwit], my attorney will need a letter soon, **I would also like the warmth of an offer letter in my hand too, more so given the $22,000 outlay,** I do of course fully understand that there will be a 'subject to Visa' clause in it, Larry have you managed to locate [Hustwit] yet, if so could you pass on my regards and email details and ask him to email me a convenient time for me to ring. [sic]

(Id.) (Emphasis added.)

On April 23, 2007, Hustwit provided plaintiff a written offer letter.  (Pl.'s Stmnt. of Facts

Ex. C.)  The offer letter stated that plaintiff would be employed as a "Line Pilot with Era Med

LLC, at an annual base salary of $58,578 plus $5,000 COLA and $1,200 compensation for ATP."

(Id.)  The offer letter does not state that Era Med would employ plaintiff for any definite period

of time.  (Id.)  Plaintiff's understanding was, in fact, that his offer of employment with Era Med

was not "for a certain period of time."  (Id. at Ex. A (Woods Dep.) 96:11-13.)  The offer letter

also does not mention plaintiff's immigration status.  (Id. at Ex. C.)  The offer letter does state

that plaintiff would receive compensation of $1,200 if he obtained an FAA-ATP license.  (Id.; see also Defs.' Stmnt. of Facts Ex. I (Hustwit Dep.) 51:8-11 ("I also told him that there was a $1,200 a year stipend for someone who did have that.").)

Plaintiff turned down another employment opportunity during this time, to work for a company in the United Kingdom.  (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 119:13-21.)  That job would have paid plaintiff approximately $140,000.  (Id. at 120:17.)  Plaintiff turned it down, however, because "there's more to a job than money."  (Id. at 120:23-24.)  "It's where you are." (Id. at 120:25.)  "And we were happy to settle in America . . . ."  (Id. at 121:15-16.)  Plaintiff also factored into his decision that the cost-of-living in London is higher than the cost of living in Philadelphia, such that the salary he was offered to work in London was not as valuable as if he had received the same salary in Philadelphia.  (Id. at 121:17-24.)

### C.  Plaintiff's Impasse with Defendants Regarding His O-1 Visa Application

At some point in July 2007, plaintiff met with Hustwit for the first time.  (Id. at 74:18-22; 75:12-14.)  In his deposition, plaintiff described this meeting as "cold."  (Id. at 74:25.)  During the meeting, plaintiff provided Hustwit with an electronic copy of a draft letter of recommendation.  (Defs.' Stmnt. of Facts Ex. A. (Woods Dep.) 55:23-25.)  The draft letter included laudatory details regarding plaintiff's background as a helicopter pilot, in order to justify the claim that plaintiff was "an alien of extraordinary ability."  (Pl.'s Stmnt. of Facts Ex. D.)  Hustwit told plaintiff that he was waiting for approval from Human Resources at Seacor before he could provide the information plaintiff wanted to support the O-1 visa application.  (Id. at Ex. A (Woods Dep.) 77:10-18.)

An email exchange between Era Med's employees on July 24, 2007, reveals that Era Med was "waiting on the proper paper work to allow [plaintiff] to work in the US."  (Id. at Ex. H.)  A

further email exchange between Era Med's employees on July 28, 2007, reveals, however, that

defendants were beginning to reconsider their job offer to plaintiff. (Id.) Hustwit wrote to Era

Med's Eastern Region Manager, Steve Gray, that Hustwit was growing "very suspicious" of

plaintiff and "less and less comfortable" about him because Hustwit believed plaintiff was

"trying to work around" Hustwit to obtain the documents he wanted for his O-1 visa application:

> Steve, this guy has been asking everyone to fill out these forms. We have told
> him that we will not. He doesn't seem to want to take no for an answer. [Human
> Resources] has referred this issue to Seacor legal council. [sic] The problem is
> that he wants us to recommend him to immigration officials and we don't know
> him. I have told Larry Murphy and John Driscoll not to count on hiring this guy
> in the short run. The fact that he is trying to work around me makes me very
> suspicious, and less and less comfortable about him.

(Id.) Nevertheless, by August 2, 2007, as revealed in an internal Era Med email, Seacor's legal

counsel concluded "that it is OK to proceed with the paperwork [plaintiff] requested for his visa

application." (Id.) Hustwit wrote to plaintiff on August 10, 2007, to confirm that Seacor's legal

counsel had given Hustwit "the go ahead" to process plaintiff's immigration paperwork. (Id.)

Shortly thereafter, Hustwit delivered to plaintiff a letter of recommendation in support of

plaintiff's O-1 visa application, revised from plaintiff's draft letter. (Id. at Ex. F.) Hustwit's

revisions softened the draft letter by deleting or changing laudatory references to plaintiff's

experience and abilities as a helicopter pilot. (Id. at Ex. E.) The revisions included a change in

the first sentence of the letter: the draft letter stated in the first sentence that plaintiff was a pilot

of "extraordinary ability"; the revised letter stated in the first sentence that plaintiff was a pilot of

"superior ability." (Id.)

Plaintiff's immigration attorneys told plaintiff that the revised letter was not adequate to

support his O-1 visa application. (Id. at Ex A (Woods Dep.) 88:13-89:8.) The main problem

was the change to the phrase "extraordinary ability," because the change did not match the

statutory language.[4]  (Id.)  Plaintiff's immigration attorneys also wanted a revised offer letter that included a start date for plaintiff's job.  (Id. at 79:2-8; 89:9-12.)  Plaintiff's immigration attorney felt that without corrections to the letter of recommendation and the offer letter, plaintiff's application for an O-1 visa was "weakened."  (Id. at 89:19.)

Plaintiff's immigration attorneys were also concerned that the fact sheet defendants had delivered to plaintiff for the O-1 visa application "was not filled in correctly" because it contained information pertaining to Seacor, Era Med's parent company, rather than to Era Med itself.  (Id. at 83:8-17.)  Defendants had also failed to provide biographical information for Hustwit, needed because Hustwit was the person signing the letter of recommendation.  (Id. at 87:19-88:5.)  Plaintiff's immigration attorneys told plaintiff that without the missing information concerning the fact sheet and Hustwit's background, they could not file the O-1 visa application at all.  (Id. at 88:9-10; 90:2-3; 91:10-12.)

On or about August 20, 2007, plaintiff's then fiancée, Lisa Bowen, called Hustwit to request directly the information and changes needed to complete the O-1 visa application.  (Id. at 184:9-185-25.)  After some discussion, Hustwit hung up the phone while Bowen was still speaking.  (Id. at 185:11-16.)  Hustwit then wrote an email to plaintiffs' immigration attorneys complaining about the "disturbing phone call" he had received from Bowen:

> Today I received a disturbing phone call from a woman who identified herself as a friend of [plaintiff].  She went on at some length about the letter of recommendation I wrote for [plaintiff], and explained that I would ruin his chances of getting his visa by removing references to his abilities such as "extraordinary abilities" and his "leading role" in our company.  I tried to explain that I was told by [plaintiff] that I could rewrite the letter as I saw fit, and that I wrote the best letter that I felt comfortable sending to a government agency.

[4]  The last sentence of the revised letter retained a reference to plaintiff as a pilot of "extraordinary ability" (id.), but plaintiff believed that if the first sentence did not use the statutory language of "extraordinary ability" immigration officials would not read further.  (Id. at Ex. J.)

(Id. at Ex. H.)  Hustwit complained to plaintiff's immigration attorneys that Hustwit did not know plaintiff well enough to revise the recommendation letter in the way that Bowen wished:

> Aside from his resume, and a single meeting with him, I have no evidence of any exemplary aviation performance on his part.  In fact, I became suspicious of his persistence at that meeting, and in correspondences after that meeting.  I have provided all of the company information that I am authorized to provide.
>
> I receive a dozen resumes each day, and probably twenty-five percent of those resumes are from applicants who have qualifications equal to or better than [plaintiff].  I appreciate the fact that [he] has invested a substantial sum to accomplish his goal of working for Era Med, and I am sympathetic to his goal, but I will not certify to an agency of the U.S. Government personal attributes that are beyond my ability to know.  If I receive another phone call from this "friend" of [plaintiff's], I will withdraw my offer of employment.  I hope you understand my position.

(Id.)

Hustwit did not revoke Era Med's offer of employment to plaintiff, but claims that eventually "I did tell him that I had to fill that position" with another pilot.  (Id. at Ex. L (Hustwit Dep.) 54:1-8.)  In a September 7, 2007, email to Hustwit, plaintiff again detailed the information that he needed from Era Med for his O-1 visa application and why.  (Id. at Ex. J.)  Plaintiff never received a response from Hustwit to this email.  (Defs.' Stmnt. of Facts Ex. A (Woods Dep.) 173:7.)  No one ever filed plaintiff's O-1 visa application.  (Pl.'s Stmnt. of Facts Ex. L (Hustwit Dep.) 84:4-7.)

## II.      Standards on Summary Judgment

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party

has met this initial burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996) (citation and internal quotation marks omitted). The non-movant must present concrete evidence supporting each essential element of its claim. Celotex, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." Ideal Dairy Farms, 90 F.3d at 744 (citation and internal quotation marks omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587.

III.    Discussion

Plaintiff claims that defendants could only revoke their job offer to him for just cause, not at will. (Pl.'s Br. 1-2.) He first argues that defendants offered him employment for a definite

period of time of between one and three years (id. at 2) because the job offer was based on the condition that he would obtain an O-1 visa, "which carries with it federal statutory lengths of time in which an employee may lawfully work in the United States" of up to three years (id. at 3-4). Alternatively, plaintiff claims that defendants could only revoke their job offer for just cause because he suffered such substantial hardship in preparing to work for defendants that he had an implied-in-fact contract for just-cause employment. (Id. at 4-5.) He claims that, in reliance on defendants' promise of a job, he took a helicopter training class he believed was necessary for the work and forewent another job opportunity. (Id. at 5.) Plaintiff further claims that defendants fraudulently deceived him by promising but failing to support his O-1 visa petition. (Id. at 6.) I conclude that no genuine issues of material fact exist, however, to support plaintiff's claims.[5]

_____

[5] Because I find that no genuine issues of material fact exist to support plaintiff's claims, it is not necessary for me to address defendants' final argument that plaintiff cannot establish that he suffered any damages as a result of defendants' conduct.

I also do not address (because defendants did not argue it) the question of whether plaintiff can be said to have had any employment contract at all, let alone one that defendants breached. It may be noted, however, that the evidence in the record establishes without dispute that Era Med would not employ plaintiff unless and until he obtained a visa to work in the United States. (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 28:7-25 ("I said at the time that I was obviously a UK citizen looking to work over there, there would be a visa issue."), 45:24-46:1 ("So, on that basis we were both proceeding, in my view, that pending the outcome of the 01 visa, of course, the position was mine.").) Plaintiff volunteered that it would be his responsibility to obtain such a visa and he did not. (Id. at 38:8-13; 78:5-8; 110:4-6; 111:2-4; 113:25-114:4; 118:4-15.) Because he was unable to do so, there was, arguably, never any employment contract between the parties, whether at-will or for a term.

It may also be noted that plaintiff appears to have given up on obtaining such a visa largely because he failed in his efforts to have Era Med misstate, exaggerate, or lie to immigration officials about Era Med's knowledge of his qualifications. Plaintiff attempted to coax Era Med into representing in a letter of recommendation to the United States government that he was a helicopter pilot of "extraordinary ability." (Id. at Ex. D (draft letter of recommendation).) Era Med was not comfortable making this representation because it did not have any first-hand knowledge of plaintiff's abilities. (Defs.' Stmnt. of Facts Ex. H (email from Hustwit to Gray, July 24, 2007) ("The problem is that he wants us to recommend him to immigration officials and we don't know him."); id. (email from Hustwit to Ebin Sandler, August 20, 2007) ("I will not certify to an agency of the U.S. Government personal attributes that

### A. Plaintiff's Claim for Breach of Contract Fails Because He Only Bargained for At-Will Employment

In Count I, plaintiff claims that defendants are liable for breach of contract. To prove a claim for breach of contract under Pennsylvania law, a plaintiff must show "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 580 (Pa. Super. Ct. 2003). In the absence of a contract to govern the employment relationship, Pennsylvania considers employment to be "at-will". Stumpp v. Stroudsberg Mun. Auth., 658 A. 2d 333, 335 (Pa. 1995); see also Scully v. U.S. WATS, Inc., 238 F.3d 497, 505 (3d Cir. 2001) (Pennsylvania law). Employment at-will is a common-law doctrine that defines the employer-employee relationship and permits the employer wide latitude in deciding how to conduct business. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 658-59 (3d Cir. 1990) (Pennsylvania law). Absent a contract, either party may terminate the employment relationship at any time, for any reason or for no reason. Id. (citation omitted).

---

are beyond my ability to know.").) Era Med's knowledge of plaintiff consisted of his resume and a limited number of interviews with company officials. No one at Era Med had ever seen him fly. Plaintiff wanted Era Med to certify to the government that he was a helicopter pilot of "extraordinary ability," a statement it reasonably felt was not justified by the facts known to company officials and which the company was, therefore, properly unwilling to make. There is no evidence in the record on which a reasonable jury could decide otherwise.

In fact, the evidence in the record establishes that plaintiff knew that Era Med lacked such knowledge and, furthermore, told Era Med that it could make any changes to the draft letter of recommendation that it wished. (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 36:24-37:8 ("I made it very clear to them that they weren't writing as to say how good Roger Woods is as a hands-on pilot, because they can't judge that, but what they could judge to is what my body of work is"); Defs.' Stmnt. Of Facts Ex. G (email from plaintiff to Murphy, April 7, 2007) ("all the company will have to do is put the petition letter onto company headed paper, clearly only after confirming that the details are both correct and factual . . . . Which they will be, but you can make any changes that you wish.") Plaintiff was unsatisfied with Era Med's changes to the draft letter of recommendation, but given plaintiff's assurance that Era Med could "make any changes that you wish" it is difficult to ascribe to Era Med any liability for making such changes.

An employee attempting to overcome the presumption of at-will employment must show clear and precise evidence of an implied-in-fact contract, which may be established by an agreement for employment for a definite duration or by the employee providing "additional consideration." Scully, 238 F.3d at 505. The term "additional consideration" refers to an employee affording an employer a substantial benefit, or undergoing a substantial hardship, other than the services which the employee was hired to perform. Stumpp, 658 A.2d at 335 (citing Darlington v. Gen. Elec., 504 A.2d 306, 315 (Pa. Super. Ct. 1986), overruled on other grounds, Krajsa v. Keypunch, Inc., 622 A.2d 355, 360 (Pa. Super. Ct. 1993)). If the employee is able to prove that he or she provided additional consideration, the court may infer that the parties intended to overcome the at-will presumption. Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh, 610 A.2d 495, 497 (Pa. Super. Ct. 1992).

Whether sufficient additional consideration is present is a question of fact and is generally for the jury to answer. Rapagnani v. Judas Co., 736 A.2d 666, 670-71 (Pa. Super. Ct. 1999). The burden of proof on the party attempting to overcome the presumption of at-will employment is, however, "very great." DiBonaventura v. Consol. Rail Corp., 539 A.2d 865, 867 (Pa. Super. Ct. 1988) (citing Veno v. Meredith, 515 A.2d 571, 578 (Pa. Super. Ct. 1986), appeal denied, 616 A.2d 986 (Pa. 1992) ("modification of an 'at-will' relationship to one that can never be severed without 'just cause' is such a substantial modification that a very clear statement of an intention to so modify is required"). Courts generally require a showing of some "extraordinary benefit" or "extraordinary detriment" before allowing the question to reach the jury. Darlington at 315. The court itself may answer questions of fact regarding the at-will presumption when "the resolution of the issue is so clear that reasonable minds would not differ on its outcome." DiBonaventura, 539 A.2d at 868 (citation omitted).

Cases finding additional consideration sufficient to overcome the at-will presumption often focus on the degree of hardship an employee endured to relocate to another region in comparison to the length of time of the employment relationship. For example, in <u>Cashdollar v. Mercy Hosp. of Pittsburgh</u>, 595 A.2d 70, 73-74 (Pa. Super. Ct. 1991), the court found that "special circumstances" existed to rebut the presumption of at-will employment because the plaintiff gave up a secure job, sold his house, and uprooted his pregnant wife and his child to move to a new state for a new job, from which he was fired after sixteen days. Similarly, in <u>News Printing Company, Inc. v. Roundy</u>, 597 A.2d 662 (Pa. Super. Ct. 1991), the court found that sufficient additional consideration existed when the plaintiff, having told his new employer that he would need six months in his new job to become effective, gave up a secure job, refused other employment, sold his house, and purchased a new house in another state four hundred miles away but was fired after three months.

If sufficient additional consideration is present in a case, a plaintiff is entitled to protection from being discharged without cause for a reasonable time. <u>Veno</u>, 515 A.2d at 580 n.4 (where an employer dismissed an employee after eight years of work, the "reasonable length of time" of employment had "surely passed" even though the employee gave up a secure job, moved his family "from Newark to Pennsylvania," and throughout the years refused other employment opportunities). The length of that "reasonable time" would be "commensurate with the hardship the employee has endured or the benefit he has bestowed." <u>Id.</u>

**1.      Plaintiff Did Not Contract for Employment for a Definite Period of Time**

Plaintiff first attempts to overcome the presumption of at-will employment by arguing that he had a contract for a definite period of time. (Pl.'s Br. 3-4.) Plaintiff claims that he contracted "either expressly or impliedly, for employment of a specific duration of a period from

one to three years." (Id. at 2.) Specifically, plaintiff argues that he contracted for "an O-1 visa which carries with it federal statutory lengths of time in which an employee may lawfully work in the United States." (Id. at 4.) Plaintiff states that "[t]he period of authorized stay for the O-1 visa is for a time the U.S. Attorney General may specify but no more than three years." (Id. at 4 (citing 8 U.S.C. § 1184(a)(2)(A); 8 C.F.R. § 214.2(o)(6)(iii)(A)(iii) ("valid for a period of time determined by the Director to be necessary to accomplish the event or activity, not to exceed 3 years"))). Plaintiff claims that there is therefore "evidence that the parties contracted for a fixed term of employment based upon the type of non-immigrant visa that Mr. Woods could have ultimately qualify for [sic]." (Pl.'s Br. 4.)

In response, defendants point out that, in his deposition, plaintiff answered "No" when asked if his offer of employment was "for a certain period of time." (Dfs.' Br. 2; Dfs.' Stmnt. of Facts Ex. A (Woods Dep) 96:11-13.) Defendants also argue that they could not themselves contract to provide plaintiff with an O-1 visa because "[t]he only entity that could have agreed to issue Plaintiff a visa is the United States Citizenship and Immigration Services, not Defendants." (Dfs.' Br. 2.) Defendants further argue that the issue of the length of time for which an O-1 visa could have been in effect is a separate issue from the length of time that defendants might have employed plaintiff. (Id.) "The fact that a visa he may have obtained would have been valid for a certain period of time does not mean that his employment would have been fixed for the same period of time." (Id.) Finally, defendants argue that the regulations regarding the length of effect for an O-1 visa do not actually guarantee a fixed period of time. (Id. at 3.) "The regulations merely state that a visa is valid for a period of time to be specified by the Attorney General, but no more than three years." (Id.)

Defendants are correct. There is no relationship between the maximum length of effect for an O-1 visa and the length of time the parties intended plaintiff to be employed. That any O-1 visa plaintiff might have obtained would have been valid for a certain period of time does not mean that plaintiff's employment would have been fixed for the same period of time. Furthermore, there can be no reasonable dispute that the regulatory definition of "no more than three years" for the duration of an O-1 visa does not constitute a definite period of time. Although there is a limit of three years to the duration of an O-1 visa, the regulations prescribe no minimum length. It is apparent from the regulations that the duration of an O-1 visa is discretionary – and that such discretion belongs not to defendants but to the Attorney General. In fact, plaintiff himself did not consider the duration of the O-1 visa to have had any bearing on the length of his employment. He admitted in his deposition that the length of his employment was not fixed. Plaintiff was extended an offer of employment solely as an at-will employee and the undisputed evidence shows that he did not contract, either expressly or impliedly, for employment for a specific duration.[6] Accordingly, from the record in this case, I can discern no circumstances that create a material issue of fact suggesting that a contract, express or implied, existed for plaintiff to be employed for a definite period of time.[7]

> **2.** **No Genuine Issues of Material Fact Exist to Support Plaintiff's Claim That He Provided Additional Consideration to Overcome The Presumption of At-Will Employment**

---

[6] The offer letter from Hustwit contained no reference whatsoever to the visa issue.

[7] The at-will analysis is not changed even though this case involves only a job offer rather than a job from which an employee was dismissed after having already started. It would not make sense to require an employer to let the employee begin at-will employment before being able to dismiss him. Browne v. Maxfield, 663 F. Supp. 1193, 1200 (E.D. Pa. 1987). When employment is indisputably at-will, as in this case, the employer could terminate the employee the next day and avoid all liability. Id. To require the employer to let the employee begin the job before dismissing him would be a useless formality. Id.

Having concluded that defendants' offer of employment to plaintiff was not for a definite period of time, I now address plaintiff's claim that he provided "sufficient additional consideration to change his employment offer from one of at-will to terminable only for cause."[8] (Pl.'s Br. 5.) Plaintiff argues that he provided such additional consideration in two ways: (1) he took a course to obtain an FAA-ATP license that he believed was necessary for the work he was to perform; (2) he turned down another, more lucrative job offer that would have required him to remain in the United Kingdom.[9] (Id.) I conclude that no genuine issues of material fact exist to support plaintiff's claim that he provided additional consideration.

a.    **Plaintiff Did Not Provide Additional Consideration When He Took a Course to Obtain an FAA-ATP License**

Plaintiff argues that in reliance on defendants' alleged assurances of cooperation regarding his O-1 visa application, "he incurred out-of-pocket expenses for US certification that he would otherwise would not have incurred or expended time on [sic]." (Pl.'s Br. 5.) He claims that such expenses constitute an "extraordinary detriment" because "Why would Woods otherwise incur substantial out-of-pocket expenses in taking the FAA coursework?" (Id.)

The first defect in plaintiff's argument is that the record is clear that he planned to take the FAA-ATP course before he interviewed with defendants and before he received any job offer

---

[8] Plaintiff confuses the issue of additional consideration by applying it to his promissory estoppel claim rather than to his claim for an implied-in-fact contract. (Pl.'s Br. 5.) As discussed below, Pennsylvania does not recognize promissory estoppel within the employment context. The issue of additional consideration is relevant to plaintiff's claim for an implied-in-fact contract alone.

[9] In their opening brief, defendants also point out that "any claim that Woods paid counsel fees, and that those should count as consideration, is refuted by Woods' own admission that he told Era Med he would handle all expenses associated with his visa." (Defs.' Br. 11 n.8.) Plaintiff does not dispute defendants' argument. Notably, in his April 7, 2007, email to Murphy, plaintiff stated that he would assume all of the risk that the O-1 visa application might be unsuccessful. (Defs.' Stmnt. of Facts Ex. G.)

from them, oral or written.  On March 2, 2007, plaintiff, seeking employment, sent an email to a

representative of Keystone Helicopters, a corporation related to Era Med, in which plaintiff

stated that he was "due to go the Florida very soon for my FAA ATP, CFI and CFII (should be

finished mid April) [sic]"  (Defs.' Stmnt. of Facts Ex. B.)  On March 8, 2007, plaintiff, seeking

employment, sent an email to Murphy, a representative of Era Med, in which plaintiff reiterated

that "I am looking to attend a rotorcraft course during the later part of March; on completion

(mid April) I will have an FAA ATP, CFI and CFII for rotorcraft."  (Pl.'s Stmnt. of Facts Ex. H.)

In that email, plaintiff stated that he planned "to be in Philadelphia by the night of the 18th at the

latest."  (Id.)  Plaintiff again emailed Murphy on March 13, 2007 – before plaintiff interviewed

with anyone from Era Med – and stated that he was already "booked to start" the FAA-ATP

course:

> To keep you updated I am still looking at travelling to America next week, if
> required i can fly to be there for Monday the 19th, i will certainly be in the US by
> the 21st.
>
> Larry, **i am booked to start my ATP, CFI/II course the following Monday.**
> [sic]

(Id.) (Emphasis added.)

In addition, plaintiff started the FAA-ATP course before he received a written offer letter

from defendants.  As plaintiff "was leaving on the airplane to go down to Florida" for the course,

he spoke to Murphy to request a written offer letter because plaintiff had "booked a course"

already.  (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 47:11-12.)  On April 7, 2007, plaintiff,

seeking a written offer letter, sent an email to Murphy in which plaintiff stated that "I have now

started the ATP, CFI/II course, all is going well [sic].  (Defs.' Stmnt. of Facts Ex. G.)  Plaintiff

did not receive a written offer letter from defendants until April 23, 2007.  (Pl.'s Stmnt. of Facts

Ex. C.)

Furthermore, plaintiff admitted in his deposition that he believed that an FAA-ATP license was a requirement for the job with Era Med. (Id. at Ex. A (Woods Dep.) 119:4-12.) If plaintiff would not have been able to perform his job functions for Era Med without such a license, then obtaining the license was not an "extraordinary detriment" amounting to additional consideration. Darlington, 504 A.2d at 315. Instead, obtaining the license would be merely a cost "commensurate with those incurred by all manner of salaried professionals" because plaintiff was merely fulfilling training required for the job. Veno, 515 A.2d at 580 (no substantial hardship when the detriments are "commensurate with those incurred by all manner of salaried professionals"); Beyda v. USAir, Inc., 697 F. Supp. 1394, 1395-96 (W.D. Pa. 1988) (no extraordinary benefit or detriment from training because it was a requirement for the job). In Beyda, the plaintiff was an aircraft pilot who relocated to Pittsburgh, Pennsylvania, to work for USAir. 697 F. Supp. at 1395. He took a one-month flight training course through the company. Id. The company forced him to resign five months after his hiring. Id. He claimed, among other things, that the training course provided additional consideration sufficient to overcome the presumption of at-will employment. Id. at 1396. The court held that "[f]light training" was not an "additional benefit or detriment" but was rather "a part of plaintiff's services which the parties contracted for" because flight training "was a requirement of the job." Id. Here, like the circumstances in Beyda, an FAA-ATP license was, according to plaintiff, a requirement of the job with Era Med.[10] The FAA-ATP course therefore could not have been an extraordinary benefit or detriment but was rather a part of plaintiff's services for which the parties contracted.

---

[10] Defendants, however, have stated that "the Line Pilot position at Era Med did not require these FAA courses." (Defs.' Reply Br. 5.) Other than his own testimony as to what he believed, plaintiff has not submitted any evidence that Era Med did in fact require the FAA-ATP course. But even if an FAA-ATP license was not necessary for plaintiff to work for Era Med, plaintiff's FAA-ATP course would still not amount to additional consideration because of the other reasons described herein.

Last, although plaintiff told defendants that he would pay for the FAA-ATP course himself (Defs.' Stmnt. of Facts Ex. A (Woods Dep.) 38:13-16; 49:7), Era Med nevertheless offered to provide some compensation for having an FAA-ATP license (Pl.'s Stmnt. of Facts Ex. C).  The offer letter stated that plaintiff would be employed as a "Line Pilot with Era Med LLC, at an annual base salary of $58,578 plus $5,000 COLA and $1,200 compensation for ATP."  (Id.)  Because defendants agreed to compensate plaintiff for a portion of the costs of obtaining the FAA-ATP license, the remaining cost to plaintiff of obtaining the license cannot amount to "additional consideration" regardless of whether the license was a requirement of the job. Incurring the remaining cost to obtain the license was merely one of the risks that plaintiff assumed when he accepted the job offer.  Rapagnani v. Judas Co., 736 A.2d 666, 670-71 (Pa. Super. Ct. 1999) (where plaintiff left behind business and home to join tour of musical but was terminated after only eight months, court found there was no additional consideration because plaintiff was merely taking the sort of risk associated with the nature of the job, "a risk for which [he] was compensated"); Susan Dagnall v. Silo, Inc., 32 Phila. Co. Rptr. 225, 228-29 (Pa. Com. Pl. 1995) (where plaintiff accepted an additional $2,000 per year for a promotion to defendant's information technology department, for which she obtained "further training as a computer programmer," the circumstances did not satisfy the additional consideration test because plaintiff "simply assumed the risks that everyone else assumes when making the uncertain transition from one job to another").

### b.    Plaintiff Did Not Provide Additional Consideration When He Turned Down Another Job Offer

Plaintiff argues that "[i]n reliance upon the agreement of April 23, 2007, and the Defendants [sic] subsequent assurances, [he] stopped looking for other employment and actually rejected at least one other *bona fide* job offer."  (Pl.'s Br. 5.)  He claims that this "forbearance"

amounted to "sufficient additional consideration" to change his job offer from one for at-will employment to one for employment that could only by terminated for just cause.  (Id.)  Foregoing another job opportunity is, however, without more, not sufficient hardship to overcome the presumption of at-will employment.  Clay v. Advanced Computer Applications, Inc., 536 A.2d 1375, 1384 (Pa. Super. Ct. 1988), rev'd in part on other grounds, 559 A.2d 917, 921 (Pa. 1989) (plaintiffs' decision to accept position offered and to stop looking for other employment was not so substantial a benefit or so detrimental a hardship as to accord plaintiffs "treatment any different from the typical at-will employee").[11]  Moreover, plaintiff stated that the cost of living in London was such that the salary he was offered to work there was a lesser benefit than the same salary would have been in Philadelphia.  In addition, he testified that he turned down the other job offer because it was in England, whereas he was seeking employment in the United States because he and his fiancée sought to settle here.

Accordingly, I will grant defendants' motion for summary judgment as to Count I of the complaint, for breach of contract.

### B.    In the Employment Context, Pennsylvania Does Not Recognize a Claim Like Plaintiff's for Promissory Estoppel

In Count III, plaintiff claims that defendants are liable to him for promissory estoppel.

Under Pennsylvania law, the doctrine of promissory estoppel allows courts to enforce promises

---

[11]  See also Darlington, 504 A.2d at 315 (foregoing job opportunity with former employer was not sufficient additional consideration "but rather was simply a reasoned choice of a new career goal."); Duvall v. Polymer Corp., No. 93-3801, 1995 WL 581910, at *17 (E.D. Pa. Oct. 2, 1995) (foregoing opportunities for employment with other company not substantial hardship); Schleig v. Communications Satellite Corp., 698 F.Supp. 1241, 1247-48 (M.D. Pa. 1988) (that plaintiffs gave up other employment opportunities was not enough to make them more than at-will employees); and see Rapagnani, 736 A.2d at 671 (given that nature of job with touring company of musical required employee to leave behind his home and business even though there was no guarantee that the musical would run for any definite period of time, employee was "merely taking the sort of risk associated" with the job when he closed his business to take it).

unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise. Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (relief under promissory estoppel claim unwarranted when implied contract for a definite term of ninety days existed) (Pennsylvania law).

As plaintiff acknowledges in his brief (Pl.'s Br. 4), however, Pennsylvania does not recognize a cause of action for promissory estoppel as an exception to the doctrine of at-will employment. Stumpp v. Stroudsberg Mun. Auth., 658 A. 2d 333, 336 (Pa. 1995) (the issue of whether an employee "detrimentally relied" on any "promises" of the employer is "simply not relevant" in determining whether the employee could be discharged) (citing Paul v. Lankenau Hosp., 569 A.2d 346, 348 (Pa. 1990) (equitable estoppel is not an exception to doctrine of at-will employment)); see also Dyche v. Bonney, 277 Fed.Appx. 244, 246, 2008 WL 1962267, at *1 n.1 (3d Cir. 2008) (the holding in Paul applies not only to the affirmative defense of equitable estoppel but also to the closely-related cause of action of promissory estoppel, because Paul rejected the theory that detrimental reliance in general could be an exception to the at-will employment doctrine) (Pennsylvania law). The Pennsylvania Supreme Court reasoned that it would undercut the doctrine of at-will employment to allow an employee to claim estoppel in cases where the law declares that no implied contract exists. Paul, 569 A.2d at 348.

Plaintiff appears to misunderstand the concept of at-will employment under Pennsylvania law. To try to rescue his claim for promissory estoppel he argues that he can rebut the presumption of at-will employment by establishing "the existence of either sufficient additional consideration or, as previously discussed, the agreement was for a definite duration." (Pl.'s Br.

4.)  Whether plaintiff contracted for employment for a definite period of time or whether plaintiff suffered substantial hardship in reliance on defendants' job offer are questions that are relevant only to plaintiff's claim for breach of contract, not to his claim for promissory estoppel.  Thus, even viewing the facts most favorably to the plaintiff, plaintiff's claim for promissory estoppel fails as a matter of law.

Accordingly, I will grant defendants' motion for summary judgment as to Count III of the complaint, for promissory estoppel.

### C.    No Set of Facts Exists to Support Plaintiff's Claim for Fraud

In Count V, plaintiff claims that defendants are liable to him for fraud.  The elements of fraud under Pennsylvania law are the following:  "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005) (quoting Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)).  From the record in this case, and viewing the facts in the light most favorable to plaintiff, the court can discern no circumstances that create a material issue of fact suggesting that defendants defrauded plaintiff.

Plaintiff claims that he "can adduce competent evidence that the Defendants made statement [sic] to Plaintiff knowing that it was false or with the intent to deceive him insofar as defendant Hustwit and ERA Med LLC expressly promised cooperation in filing Woods' O-1 visa application and utterly failed to do so."  (Pl.'s Br. 2.)  Plaintiff argues that "Defendant Hustwit's actions, and inactions, from the job letter of April 23, 2007 until September 2007, in failing to cooperate with basic information requirements for the O-1 visa petition constitute

misrepresentations which were made knowingly or recklessly, on which Mr. Woods relied upon [sic]." (Id. at 6.)

Plaintiff does not, however, explain how any alleged promise of cooperation or alleged failure of cooperation constituted a misrepresentation, and certainly does not do so with the "clear and convincing" proof required in Pennsylvania for a claim of fraud. Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Inv., 951 F.2d 1399, 1409 (3d Cir. 1991) (Pennsylvania law). Plaintiff must submit evidence from which a jury could find that a representative of Era Med, such as Hustwit, told plaintiff that Era Med would provide information for plaintiff's O-1 visa application even though he or she knew at the time that Era Med would not do so and, in fact, made the promise with the specific intent to deceive plaintiff. Carlson, 918 F.2d at 416-17. Plaintiff has not come forward with any such evidence of fraudulent intent. Plaintiff's only allegations in support of his claim for fraud are that Hustwit "promised" but "fail[ed] to cooperate with basic information requirements for the O-1 visa petition." (Pl.'s Br. 2, 6.) The nonperformance of a promise, however, is not in itself evidence of fraud. Id. (citing Fidurski v. Hammill, 195 A. 3, 4 (Pa. 1937) (per curiam); McCreary v. Edwards, 172 A. 166, 167-68 (Pa. Super. Ct. 1934) (en banc)); see also Permenter v. Crown Cork & Seal Co., Inc., 38 F.Supp.2d 372, 382 (E.D. Pa. 1999) (plaintiff could not make "even a weak showing of intent to defraud or mislead" with regard to offer of employment where he had not pointed out with clear and convincing evidence "either in pleadings or in his response to the motion for summary judgment, any particular misrepresentation, made knowingly or recklessly, on which he relied").

Plaintiff has not even identified the terms of any alleged promise of cooperation made by Hustwit or Era Med, including how far any such cooperation was intended to extend. Plaintiff's

April 23, 2007, offer letter makes no mention of the O-1 visa, let alone any promise to cooperate in the filing of the application for it.  (Pl.'s Stmnt. of Facts Ex. C.)  Furthermore, any promise Hustwit or another representative of Era Med might have made to cooperate with plaintiff's O-1 visa application must be seen in light of plaintiff's own statements that plaintiff expected Era Med's cooperation to be only limited.  Plaintiff unequivocally stated in his deposition that he told Larry Murphy and John Driscoll of Era Med that he would pay for his own immigration attorneys to prepare the O-1 visa application and to file it.  (Pl.'s Stmnt. of Facts Ex. A (Woods Dep.) 38:8-13; 78:5-8; 110:4-6; 111:2-4; 113:25-114:4; 118:4-15.)  He claimed that there would be "no risk" and "no outlay" on Era Med.  (Defs.' Stmnt. of Facts Ex. A (Woods Dep.) 49:7-10; 95:17-21.)  He clearly undertook the obligation to process the O-1 visa application and to complete the appropriate forms.  There is no evidence to support a claim that Era Med was to file the application instead of plaintiff.

In addition, plaintiff's own testimony was that he did not tell Era Med any details of what Era Med would have to say in the letter of recommendation it was to provide in support of his O-1 visa application.  (Id. at 258:4-259:9.)  In fact, he expressly and explicitly told Murphy that Era Med could alter plaintiff's draft of the letter to "make any changes that you wish":

> The company will not really have to do much for the visa, my attorney will draft a letter from the information that I have given him . . . all the company will have to do is to put the petition letter onto company headed paper, clearly only after confirming that the details are both correct and factual . . . .  Which they will be, but **you can make any changes that you wish.** [sic]

(Defs.' Stmnt. of Facts Ex. G.) (Emphasis added.)  Given that plaintiff stated that Era Med could make any changes to the draft letter of recommendation that it wished, it is not evidence of fraud that Hustwit's changes were not satisfactory to plaintiff.  There is simply no evidence, even when viewing the facts most favorably to plaintiff, on which a reasonable jury could find that any

alleged promise to cooperate in filing plaintiff's O-1 visa application (or any action or inaction by defendants in allegedly failing to provide that cooperation) was a knowing or reckless misrepresentation made, at the time, with the specific intent to deceive plaintiff. Cashdollar, 595 A.2d at 75 (upholding dismissal of claim that employer fraudulently induced plaintiff into accepting employment to his detriment because plaintiff failed to establish "by clear and convincing evidence" that the alleged misrepresentation "was made knowingly with the intent to deceive or in reckless disregard for the truth or falsity of the matter.")

Accordingly, I will grant defendants' motion for summary judgment as to Count V of the complaint, for fraud.

## IV.    Conclusion

Even viewing the facts in the light most favorable to plaintiff, the non-moving party, I find that there is no evidence in the record to support plaintiff's claims for breach of contract, promissory estoppel, or fraud. Plaintiff did not contract for anything other than at-will employment. In addition, under Pennsylvania law, a plaintiff cannot rely upon the doctrine of promissory estoppel to overcome the presumption of at-will employment. Finally, there is no evidence that defendants' alleged promises to cooperate with the filing of plaintiff's O-1 visa application or defendants' alleged failures to do so were material misrepresentations made knowingly or recklessly with the intent to deceive plaintiff. Accordingly, I will grant defendants' motion for summary judgment as to all claims.